WESTERN WATERSHEDS PROJECT, et al., Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, Defendant.

No. CV-13-01028-PHX-PGR

United States District Court, D. Arizona.

Signed 03/31/2016

Erik Bowers Ryberg, Attorney at Law, Etna, CA, Lauren M. Rule, Advocates for the West, Portland, OR, for Plaintiffs.

Rachel Kathleen Roberts, U.S. Dept of Justice, Seattle, WA, for Defendant.

## ORDER

Paul G. Rosenblatt, United States District Judge

This case involves challenges under the National Environmental Policy Act ("NEPA") to the Bureau of Land Management's ("BLM") decision regarding the management of livestock grazing on the Sonoran Desert National Monument (the "SDNM"). Specifically, Plaintiffs Western Watershed Project and Sierra Club (collectively, "WWP") contend that the process by which BLM made its decision to allow grazing on the SDNM lands north of Interstate Highway 8 ("I-8") was not adequately explained nor adequately supported by the administrative record ("AR") and thus violates NEPA. The parties filed cross-motions for summary judgment, and the Court granted in part and denied in part summary judgment in favor of WWP, and denied BLM's cross-motion for summary judgment. (Doc. 55.) At the suggestion of BLM, the Court remanded the case to BLM for further proceedings consistent with the Court's Order and required BLM to file a supplemental report that either provided the required reasoned explanations and responses, or indicated that BLM would be adopting different decisions with reasoned explanations that supported them. (Id.) BLM has filed its report (Doc. 59-1), and the parties have renewed their motions for summary judgment (Doc. 64 (WWP); Doc. 66 (BLM)). The Court will grant summary judgment in favor of WWP to the extent WWP seeks to have BLM complete a new Land Health Evaluation ("LHE") and compatibility determination, and incorporate that information into the Range Management Plan ("RMP"). The Court will deny BLM's cross-motion for summary judgment.[1]

## Standard and Scope of Review

Under NEPA, federal agencies are required to consider the consequences of their actions on the environment. NEPA's mandate is "essentially procedural..... It is to ensure a fully informed and well considered decision." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351

---

1. The Court finds that oral argument would not assist in resolving this matter and accordingly finds the pending motions suitable for decision without oral argument. *See* LRCiv 7.2(f); Fed.R.Civ.P. 78(b); *Partridge v. Reich,* 141 F.3d 920, 926 (9th Cir.1998).

(1989). The goals of NEPA are to (1) ensure the agency will have detailed relevant information on significant environmental impacts when it makes its decisions and (2) guarantee that this information will be made available to the larger audience "that may also play a role in both the decision-making process and the implementation of that decision.'" *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 924 (9th Cir.2015) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). The Court is required to "strictly interpret the procedural requirements in NEPA [and the implementing regulations] to the fullest extent possible consistent with the policies embodied in NEPA." *WildEarth*, 790 F.3d at 924.

▮ Because NEPA does not provide its own standard of review, the Court's review is governed by the Administrative Procedures Act ("APA"). Under the APA, an agency's decision can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Review under the arbitrary and capricious standard is narrow, and this Court is not to substitute its own judgment for that of the agency. *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*).

▮ While agency decisions are granted deference, such decisions are not spared a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *see Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 (A court's review of

administrative action "must be searching and careful," though "the ultimate standard of review is a narrow one.") (internal quotation marks omitted). To withstand such review, an agency must have considered the relevant information and provided a satisfactory explanation for its actions, drawing a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). "An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law." *In Defense of Animals, Dreamcatcher Wild Horse and Burro Sanctuary v. United States Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir.2014).

**Discussion** [2]

### A. Use of the Supplemental Report

The Court provided BLM with the opportunity to submit a supplemental report based on the suggestion by BLM that, if given the opportunity, it would be able to fully explain its LHE analysis. BLM specifically asserted that the "contours of any supplemental explanation should be left to the discretion of the agency." (Doc. 53 at 17 n.8.) Thus, while the Court required BLM to file a supplemental report, the Court did not provide BLM with specific guidance regarding that report.

BLM has now filed its supplemental report and the parties disagree as to whether and to what extent the report can be used in the Court's review of whether BLM complied with NEPA. BLM argues that its supplemental report provides the

---

**2.** Background information can be found in the Court's previous Order (Doc. 55) and will

not be repeated here.

reasoned explanations required under NEPA, and that the report is not an impermissible post-hoc rationalization because the report merely explains existing information in the AR, and does not provide a new rationalization for BLM's decisions. (Doc. 66 at 3.) WWP argues that the supplemental report is merely a post hoc rationalization that is neither found in nor supported by the AR, and that the report cannot provide the reasoned explanations required under NEPA. (Doc. 64 at 3-4.)

 In determining whether an agency has complied with NEPA's requirements, a "court's review is limited to the administrative record." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir.1994). Reviewing courts have, however, allowed an agency to provide supplemental information in NEPA cases in certain limited situations. *See, e.g., Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir.1984); *Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F.Supp.2d 1075, 1105 (E.D.Cal.2004), *aff'd* 450 F.3d 428 (9th Cir. 2006). Specifically, the supplemental information provided by the agency must be merely "explanatory in nature, rather than a new rationalization of the agency's decision, and must be sustained by the record." *Kunaknana*, 742 F.2d at 1149.

Based on this authority and BLM's indication that it could provide an explanation for its decisions, the Court required BLM to prepare and file a supplemental report. However, the Court can use the information in the report for purposes of NEPA review only if the information is explanatory in nature and sustained by the administrative record ("AR"). *See Kunaknana*, 742 F.2d at 1149. The report cannot be used to provide an explanation that is not

sustained by the record or a new rationalization for BLM's decision. *See id.* As discussed below, the vast majority of the information in the supplemental report is not sustained by the record and/or provides a new rationalization and thus does not fall within the narrow exception under which information in supplemental reports can be considered in conducting NEPA review.[3]

## B. Identification of Desired Plant Community Objectives (the "Setting-Objectives" Step)

 The Court previously found that BLM did not provide an adequate explanation in the AR to support its setting of, and adjustments to, the desired plant community objectives for the Limy Fan, Sandy Wash, Limy Upland, Loamy Swale, Sandy Loam Deep, Limy Upland Deep, and Granitic Hills ecological sites, and that BLM's setting of these plant community objectives was therefore arbitrary and capricious. (Doc. 55 at 10-13.) BLM's supplemental report does not remedy the deficiencies found by the Court as it does not provide citations to the AR that sustain the explanations set forth in the report, and the report sets forth new rationalizations for BLM's decisions.

In the AR, BLM explained that Desired Plant Community ("DPC") objectives ("objectives") "are specific to each ecological site and based on comparison area data collected from" the BGR/A by Pacific Biodiversity Institute ("PBI") and BLM; and that this data was analyzed for each site "along with information from the National Resources Conservation Service (NRCS) Ecological Site Descriptions [ESDs] to estimate the potential or capability of the

---

**3.** As noted, a primary objective of NEPA is to ensure information is made available to the larger audience so that they can play a role in both the decision-making process and the implementation of that decision. *See WildEarth Guardians,* 790 F.3d at 924. The non-NEPA cases BLM relies on (*see* Doc 66 at 1-3) are inapposite.

site to produce different kinds and amounts of vegetation so that the DPC objectives are realistic in terms of what is possible to achieve." (AR 074608.) "Due to the variability within an ecological site, the average value for each attribute tied to the indicators for land health were used to quantify the DPC objectives." (*Id.*)

### 1. *Ecological Site Objectives based on BGR/A Data*

According to the AR, BLM set the final objectives for the Limy Fan, Sandy Wash, and Limy Upland Deep ecological sites based on the average BGR/A value for each attribute, along with information from the ESDs. (AR 074608, 074621.) As discussed in the Court's prior Order (Doc. 55), comparison of the BGR/A data and BLM's final objectives demonstrates that the final objectives for these sites are not consistent with the average BGR/A data, and no explanation was provided in the AR for the adjustments made. The Court also noted that BLM's explanation in its brief for the adjustments was not contained in the AR and, further, did not adequately explain or account for the wide variance in the adjustments. (Doc. 55 at 11.)

In the supplemental report, BLM cites two key reasons for making adjustments to the average BGR/A value [4]: lower precipitation north of Interstate 8 ("I-8") and information from the ESD sheets. (*See* Doc. 59-1 at 2-5.) For example, the report states:

> In general, lower elevation and lower average precipitation levels will result in reduced potential for production, composition and canopy cover. The majority of the SDNM north of Interstate 8 occurs at lower elevations and lower average

precipitation as compared to south of Interstate 8 in the BGR/A comparison area. The majority of the ecological sites in SDNM north of Interstate 8 occur at the lower end of the 7-10' precipitation zone and with some areas occurring even slightly lower than 7' of precipitation.

(Doc. 59-1 at 2 (citing AR 054933).)

In support of this explanation, BLM cites to a map showing average annual precipitation. (*See id.*) The map shows that the average annual precipitation on the BGR/A varies by area, from a high of 10-12' to a low of 6-8'; and that the average annual precipitation on the SDNM lands north of I-8 similarly varies by area, from a high of 8-10' to a low of 6-8'. (*See* AR 054933.) This map does not, however, support BLM's adjustments to the BGR/A average values in setting the objectives.

The AR does not indicate that the map, or the lower average precipitation north of I-8, was used or considered by BLM in making the adjustments, and BLM has not provided any other citation to the AR. Further, a comparison of the precipitation map (AR 054933) with the BGR/A plots used to set objectives (*see* AR 054932, 074621) demonstrates that the majority of the BGR/A plots used to set the objectives are in the 6-8' or 8-10' precipitation zones. In other words, most of the BGR/A data was collected from the same precipitation zones that are found on the SDNM north of I-8. Thus, the precipitation map does not sustain the lower precipitation explanation but instead undercuts it. Further, as shown by the following table, there are large variances in the adjustments made by BLM and BLM has provided no explanation for those large variances.

---

4. The supplemental report also states that the average *and range* of the BGR/A values were used in setting the objectives. (Doc. 59-1 at 2 (emphasis added).) However, the AR does not state that the *range* of the BGR/A values was used in setting objectives; rather, the AR states that the *average* BGR/A value was used (AR 74608).

| Ecological Site | Vegetation | BGR/A Avg. | Objective | % Reduction |
| --- | --- | --- | --- | --- |
| Limy Fan | Composition | 10% | 9% | 10% |
| Limy Fan | Canopy Cover | 8.8% | 7% | 20% |
| Sandy Wash | Canopy Cover | 37% | 34% | 8% |
| Limy Upland Deep | Composition | 23.5% | 12% | 49% |
| Limy Upland Deep | Canopy Cover | 13% | 10% | 23% |

In sum, and as discussed in more detail below, the citations to the AR provided by BLM do not sustain the supplemental report's explanation that BLM relied on variance in precipitation in adjusting the average BGR/A values and do not sustain the level of adjustment made for each of the ecological sites or the variances in those adjustments. Thus, the supplemental report's explanation is not sustained by the AR and the explanation is a new rationalization for BLM's decisions. This new rationalization cannot be used to cure the deficiencies in the AR previously identified by the Court that render BLM's decisions in setting the objectives arbitrary and capricious.

### a. Limy Fan

#### Composition

The supplemental report discusses the ESD for the Limy Fan ecological site, and notes that this "ecological site is generally at the lower elevations and precipitation zone of the Monument on desert flats and valley bottoms." (Doc. 59-1 at 3 (citing AR 74591, 084928, 084939-40).) The supplemental report then states: "The composition average for BGR/A was 10% (from a range of 0-28%), and BLM made a downward adjustment to 9% for the composition objective to compensate for the lower elevation and precipitation North of I-8." (Doc. 59-1 at 3 (citing AR 074621).) The AR at the citation provided by BLM in support of this explanation does not, however, discuss precipitation or otherwise state that the average BGR/A value was adjusted based on lower precipitation north of I-8, based on lower elevation, or based on the range in BGR/A values. The supplemental report's explanation is not, therefore, sustained by the AR and the explanation is a new rationalization for the Limy Fan composition objective.

#### Canopy Cover

The supplemental report states that the "objective for canopy cover for the Limy Fan ecological site was based on the canopy cover values for the BGR/A. The BGR/A canopy cover had an average value of 8.8% for this site. BLM set the objective for this site at 7% canopy for the lower precipitation and reduced canopy cover potential north of Interstate 8 as compared to BGR/A." (Doc. 59-1 at 3 (citing AR 074609).) The AR at the citation provided by the supplemental report does not, however, discuss precipitation or reduced canopy cover potential, let alone indicate that the BGR/A average value was adjusted based on these considerations. The supplemental report's explanation is not, therefore, sustained by the AR and the explanation is a new rationalization for the Limy Fan canopy cover objective.

### b. Sandy Wash

#### Canopy Cover

The supplemental report states that the ESD for canopy cover for Sandy Wash ranges from 25% to 40%, and that the BGR/A average value is 37%. (Doc. 59-1 at 4.) The report goes on to state that BLM set the 34% objective for Sandy Wash canopy cover by adjusting downward from the average BGR/A value to "compensate for the lower precipitation and reduced canopy cover potential north of Interstate

8 as compared to BGR/A." (*Id.* (citing AR 074608, 084988).) However, the AR at the citations provided by BLM does not discuss or otherwise indicate reliance on lower precipitation or reduced potential north of I-8 in making the adjustment to the BGR/A average value. (*See* AR 074608, 084988.) The supplemental report's explanation is not, therefore, sustained by the AR and the explanation is a new rationalization for the Sandy Wash canopy cover objective.

### c. Limy Upland Deep

#### Composition

The supplemental report states that the average composition within the BGR/A for the Limy Upland Deep ecological site is 23.5%, "which is well above the site potential average of 18.1% for composition"; that "[s]etting an objective equal to the BGR/A composition would be an unrealistic objective"; and that, in addition, the lower elevation and lower precipitation north of I-8 "led BLM to set the objective at 12%." (Doc. 59-1 at 4.) No citation to the AR is provided by BLM in support of this explanation. (*See Id.*) The supplemental report's explanation is not, therefore, sustained by the AR and the explanation is a new rationalization for the Limy Upland Deep composition objective.

#### Canopy Cover

The supplemental report states that the canopy cover for Limy Upland Deep was based on the BGR/A average of 13%, and adjusted "downward to compensate for the lower precipitation and reduced canopy cover potential north of Interstate 8 as compared to BGR/A." (Doc. 59-1 at 4 (citing AR 074609).) The AR at the citation provided by BLM does not, however, discuss or otherwise indicate reliance on lower precipitation or reduced potential north of I-8 in making the adjustment. The supplemental report's explanation is not, therefore, sustained by the AR and the explanation is a new rationalization for the Limy Upland Deep canopy cover objective.

### 2. *Ecological Site Objectives based on the ESDs*

For the three ecological sites without BGR/A data—Loamy Swale, Limy Upland, and Sandy Loam Deep—BLM stated it based its objectives on the low end of the ESDs. As discussed in the Court's prior Order (Doc. 55 at 11-12), comparison of the ESDs and BLM's final objectives demonstrates that the final objectives are not consistent with the low end of the ESDs.[5] Further, BLM set objectives for "palatable browse" for the Limy Upland and Sandy Loam sites, and an objective for "perennial grass composition" for the Loamy Swale site, but the ESDs do not include objectives for "palatable browse" or "perennial grass composition," and no explanation was provided in the AR on how these objectives were set. (*Id.*) The following table sets forth the adjustment made by BLM to the ESD for Limy Upland in setting the canopy cover objective and, as noted, where objectives were set for Loamy Swale, Limy Upland, and Sandy Loam Deep based on vegetation types not described in the ESDs.

---

**5.** The Court does not address whether the setting of the objectives at the low end of the ESDs can be justified based on the AR because, even assuming that it could be, as discussed below, BLM has not justified adjust- ments it made to the low end of the ESDs in setting the objectives.

| Ecological Site | | ESDs | Objective | % Reduction |
|---|---|---|---|---|
| Loamy Swale | Perennial Grass | ------- | 10% | ------- |
| Limy Upland | Canopy Cover | 20-25% | 12% | 40% |
| Limy Upland | Palatable Browse | ------- | 5% | ------- |
| Sandy Loam Deep | Palatable Browse | ------- | 16% | ------- |

As discussed in more detail below, the AR at the citations provided by BLM does not sustain the supplemental report's explanations for the setting of these objectives, and the explanations are new rationalizations for BLM's decisions. These new rationalizations and unsustained explanations cannot be used to cure the deficiencies in the AR previously identified by the Court that render BLM's decisions in setting the objectives arbitrary and capricious.[6]

### a. Loamy Swale—Perennial Grass

BLM set an objective for Loamy Swale perennial grass composition even though there is no "perennial grass composition" contained in the Loamy Swale ESD. The supplemental report states that BLM set the perennial grass composition for Loamy Swale "at 10% using a combination of information from the ESDs and current site-specific information." (Doc. 59-1 at 6 (citing AR 074609).) The report explains:

> BLM used the ESD functional groups 1, 2, and 3 to represent grass composition. The annual production in pounds per acre for these groups ranges from 90 to 162. The total annual production pounds per acre for the site ranges from 1380 to 2220, with an average of 1800. The average of these groups, then, ranges from 90/1800 = 0.05 or 5% to 162/1800 = 0.09 or 9% composition. Considering the ESD information and current state of the vegetation, BLM considered 10% as a realistic [objective].

(Doc. 59-1 at 6 (citing AR 084956-57, 084965, 084952).)

The AR at the citations provided by BLM are merely citations to the ESD for Loamy Swale. Although the ESD contains the figures used by BLM in its calculation, the ESD does not explain how BLM came up with the objective for perennial grass composition, does not mention the current state of vegetation, or explain why an adjustment from 9% to 10% was made in setting the objective. The AR does not, therefore, sustain the supplemental report's explanation, and the explanation is a new rationalization for BLM's setting of the Loamy Swale perennial grass objective.

### b. Limy Upland—Canopy Cover

BLM set the canopy cover objective for the Limy Upland ecological site at 12%, a reduction from the low end of the 20-25% canopy cover potential set forth in the ESD. The supplemental report states that this objective

> was based on the canopy cover value for the similar Limy Upland Deep site in the BGR/A. The Limy Upland Deep site is adjacent to the Limy Upland site, but at slightly lower elevations (and thus lower precipitation) and has a similar plant community and similar soils. BLM observed that the canopy cover value (13%) for the Limy Upland Deep site in the BGR/A was significantly lower than the canopy cover range identified in the ESD reference sheet for the Limy Up-

---

6. BLM also, again, relies on lower average annual precipitation north of I-8 as an explanation for its adjustments and setting of the objectives. As already discussed in relation to the ecological site objectives based on the BGR/A, the AR does not sustain this explanation and the precipitation explanation is a new rationalization for BLM's decisions.

land site (20-25%). Because the BGR/A data was so much lower, BLM determined that setting an objective at the level identified by the ESD reference sheet would be unrealistic and unobtainable. BLM set the canopy cover objective at 12%, which is slightly higher when compared to the objective for the Limy Upland Deep site (10%) to account for the slightly higher precipitation.

(Doc. 59-1 (citing AR 084908, 074609).)

The AR at the citations provided by BLM does not, however, provide this or any other explanation for the adjustment made by BLM. The ESD (AR 084908) merely states the canopy cover potential for Limy Upland is 20-25%. The AR at the other citation provided by BLM (AR 074609) merely states the following rationale for setting the canopy cover objective at 12%: "Appropriate vegetative cover levels will prevent accelerated erosion of ecological sites ... and provide for wildlife habitat." The AR does not include any reference to or indication of reliance on the BGR/A values for the Limy Upland Deep site in setting the Limy Upland canopy cover objective; nor does the AR provide any other explanation for adjusting from the low end of the ESD in setting the objective. The AR does not, therefore, sustain the supplemental report's explanation, and the explanation is a new rationalization for BLM's setting of the Limy Upland canopy cover objective.

### c. Limy Upland and Sandy Loam Deep—Palatable Browse

BLM set objectives for "palatable browse" for the Limy Upland and the Sandy Loam Deep ecological sites even though there is no designation for "palatable browse" contained in the ESDs for these sites. As to the Limy Upland palatable browse objective, the supplemental report states that BLM set the palatable browse objective at 5% using ESD infor-

mation and "site-specific factors," explaining:

> Functional group 8 of the ESDs represents palatable browse production, with a range of 10 to 20 pounds per acre. The total annual production range is 138 to 210 pounds per acre, with an average of 174. The palatable browse, then, ranges from 10/174 = 0.57 or 6% to 20/174 = .114 or 11%. The BLM considered this ESD information and that this site occurs at the lower end of the 7 to 10 inch precipitation gradient for the Ecological site. Accounting for these variabilities, BLM set the objective for palatable browse at 5%.

(Doc. 59-1 at 6 (citing AR 084900-01, 084903, 084889, 074633-34).)

Similarly, as to the Sandy Loam Deep palatable browse objective, the supplemental report states that BLM set the palatable browse objective at 16% using ESD information and "site-specific factors," explaining:

> Functional group 8 of the ESDs represents palatable browse, with the exception of triangle bursage, which is not palatable. The annual production range is 70 to 150 pounds per acre. The range of the total production is 400 to 575 pounds per acre, with an average of 487 pounds per acre. The average for this site, then, ranges from 70/487 = 0.144 or 14% to 150/487 = 0.308 or 31% Considering this ESD information and because this Sandy Loam Deep site (only one site occurs in the SDNM) is currently achieving the objective at 16% for composition of palatable browse species, BLM set the objective to maintain the current acceptable conditions at this site.

(Doc. 59-1 at 7 (citing AR 074611, 084983, 084970).)

The AR at the citations provided by BLM does not, however, provide these or any other explanations for the palatable browse objectives. The ESDs do not designate "palatable browse" or explain how BLM came up with the objective for palatable browse. (*See* AR 084900-01, 084903, 084889, 084983, 084970.) The other portions of the AR to which the supplemental report cites (AR 074611, 074633-34) mention "palatable browse," but do not define it or provide any explanation regarding how the palatable browse objectives were set. The AR does not, therefore, sustain the supplemental report's explanation, and the explanation is a new rationalization for BLM's setting of the Limy Upland and Sandy Loam Deep palatable browse objectives.

### 3. Objectives for Saguaro Recruitment

BLM set the objectives for saguaro recruitment for the Limy Upland ecological site at 0.96 and for the Granitic Hills ecological site at 0.83. BLM informed the Court previously that, "[i]n setting these objectives, BLM considered saguaro recruitment in the BGR/A, which occurred at a rate of 1.26 young saguaros per plot across different types of ecological sites, and then adjusted these rates downward to account for lower precipitation levels in the ecological sites containing saguaro cacti forests north of I-8." (Doc. 49-1 at 19-20.) The Court found BLM's explanation to be inadequate because it was not contained in the AR and, further, did not explain the wide variance in the adjustments made. (Doc. 55 at 12.)

The supplemental report states: "The BGR/A data are used only as a means of comparison and do not represent a direct conversion to the objectives set for the

sites within the SDNM." (Doc. 59-1 at 8.) This explanation is inconsistent with the prior representations BLM made to the Court. Specifically, BLM previously informed the Court that, in setting these objectives, BLM considered the saguaro recruitment rate in the BGR/A (1.26) and then adjusted the rate downward to account for lower precipitation levels. (*See* Doc. 49-1 at 19-20.) Further, as discussed in more detail below, the AR does not sustain the explanations provided by BLM and the supplemental report's explanations are new rationalizations that cannot be used to cure the deficiencies in the AR previously identified by the Court that render BLM's decisions in setting the objectives arbitrary and capricious.[7]

As to Limy Upland, the supplemental report states:

> The [PBI] Saguaro Data showed the saguaro recruitment rate ("short stems") in the SDNM (outside the BGR/A) is 0.96 ... on the Palo Verde-Mixed Cacti-Mixed Scrub on Bajadas vegetation community, which includes Limy Upland. (AR 74708). Based on a relatively small data set, PBI indicated a value of zero for saguaro recruitment in BGR/A. (AR 74708). Because the BGR/A data had zero recruitment rates, BLM used 0.96 as the objective for Limy Upland Ecological Site. Based on BLM's professional judgment this was an appropriate recruitment rate for the site. (AR 74610).

(Doc. 59-1 at 8.)

As already noted, this explanation contradicts the explanation previously provided by BLM that it set the objective based on the BGR/A data of a 1.26 recruitment rate and adjusted for lower precipitation.

7. Again, BLM relies on a lower precipitation justification for SDNM lands north of I-8. As already discussed in relation to the other eco-logical site objectives, the AR does not sustain this explanation for the adjustments made by BLM.

Further, the AR at the citations provided by BLM do not support this new explanation. The AR merely states that "[m]aintaining the current recruitment rate for saguaros of 0.96 ... is appropriate for this ecological site north of I-8." (AR 74610.) There is no explanation in the AR of why this recruitment rate is appropriate.

As to Granitic Hills, the supplemental report states:

> PBI showed a saguaro recruitment rate of 1.26 in BGR/A and 0.83 in the remainder of SDNM. The PBI, however, conducted the study of the BGR/A "primarily in the volcanic hills 7-10' and 10-13' precipitation zone ecological sites, with the data being combined from both sites." (AR 74610). "Saguaro stem count values in the [BGR/A] plots could potentially be greater due to the difference in the ecological sites and increased precipitation." (AR 74610). Also, the potential saguaro population varies by elevation, aspect, precipitation, and soil type. (AR 74610). Therefore, BLM used the SDNM plot data, outside of BGR/A, as the more accurate data to set the recruitment rate objective. (AR 74708).

(Doc. 59-1 at 8.)

Again, and as already noted, this explanation contradicts the representation previously made by BLM to the Court that it set the Granitic Hills saguaro recruitment objective based on the BGR/A data and adjusted for lower precipitation. Further, although the AR indicates that the "stem count values in the [BGR/A] could potentially be greater due to the difference in the ecological sites and increased precipitation," no explanation is provided in the AR as to the level of adjustment made to the BGR/A values, or why the current recruitment rate of 0.83 was appropriate. (*See* AR 74610.)

Attachment 5, which is referred to in the explanations provided by the AR for both the Limy Upland and the Granitic Hills sites, and cited to in the supplemental report, is merely a table setting forth PBI data from 2004, showing saguaro cover and stem count information for the Palo Verde-Mixed Cacti Community. (AR 74708). This table of PBI data does not provide the explanation set forth in the supplemental report, and BLM has not provided the Court with any further citations to the AR.

In sum, the supplemental report's explanations for the setting of the Limy Upland and Granitic Hills saguaro recruitment objectives are not sustained by the AR. Further, these explanations contradict BLM's previous position that the saguaro recruitment objectives were set based on BGR/A values and adjusted downward based on lower precipitation. Moreover, even in the supplemental report, BLM fails to provide a reasoned explanation supported by the record as to why the current recruitment rates are appropriate. The supplemental report has provided explanations that are not sustained by the AR and are new rationalizations for its decisions in setting the objectives.

## C. Determination of Whether Desired Plant Community Objectives Are Being Met (the "Meeting-Objectives" Step)

### 1. *Exclusion of BLM data*

The Court previously found that BLM's decision to use 2004 data for the Beloat allotment was arbitrary and capricious because BLM did not provide an adequate explanation in the AR as to why the 2004 data was the "best available data," rather than the 2007 and 2009 data BLM had available for that allotment. (Doc. 55 at 13-14.) In the supplemental report, BLM states that it used the most recent data available for each plot on the Beloat allotment, "except when the data

collected did not follow the appropriate protocol in place at the time." (Doc. 59-1 at 9.) This most recent data, BLM asserts, is the best data available to it.

BLM asserts, and WWP does not dispute, that as to three of the plots, BLM made a typographical error in its data tables and that BLM actually used 2007 data rather than 2004 data. (Doc. 59-1 at 9; Doc. 64 at 12.) As plots B-1 and B-2, the supplemental report explains that these plots were not evaluated in 2007 or 2009 and that, thus, 2004 vegetation composition data was the best available data. (Doc. 59-1 at 8-9.) As to canopy cover for plot B-4, the supplemental report explains that BLM used 2004 data because it determined that the field data collected in 2007 for canopy cover did not follow applicable protocol of study design that was in place at the time, and that no data was collected on B-4 in 2009. (Doc. 59-1 at 9.) Finally, as to vegetation composition for plots B-4, B-5, and B-8, the supplemental report explains that there was no 2004 or 2009 data and that BLM therefore used the 2007 vegetation composition data. (Doc. 59-1 at 9.)

WWP argues that the AR demonstrates that data was collected on the Beloat allotment in 2009 and that BLM does not explain why it did not use that data in its analysis. (Doc. 64 at 12 (citing AR 58314, 58316, 58318-23, 58331).) BLM, in response, notes first that some of the plots for which data is available from 2009 are outside the SDNM. (Doc. 66 at 14.) Second, BLM explains that for the plots within the SDNM, the tables WWP relies on "mistakenly describe certain data as being collected in 2009 when it was actually collected in 2007." (Doc. 66 at 14.) A comparison of the data at the AR citations provided by BLM supports this explanation, and WWP does not contest BLM's explanation (*See* Doc. 68 at 9). However, WWP does assert that, although these errors may not constitute a per se NEPA violation, "it certainly calls into question the accuracy of other information reported in the EIS and Supplemental Report." (Doc. 68 at 9-10.) The Court agrees that these additional errors in relation to the Beloat allotment data are troubling. However, the Court does not find these errors sufficient to call into question the accuracy of the other information used by BLM in the EIS and supplemental report.

In sum, the explanations provided by the supplemental report are sustained by the record and cure the previous deficiencies found by the Court regarding the exclusion of certain BLM data in relation to the Beloat allotment.

## 2. *Exclusion of PBI data*

### a. Exclusion of PBI data for failure to incorporate certain factors

In determining whether desired plant community objectives were being met, BLM rejected some PBI data based in part on the failure of that data to incorporate certain factors, such as livestock intensity, frequency, timing, season of use, and precipitation pattern. The Court found this basis for rejecting some of the PBI data to be arbitrary and capricious because BLM did not provide a reasonable explanation in the AR as to why it rejected some PBI data based on failure to incorporate these factors, but then (1) used other PBI data and BLM's own plot data, even though that data also did not incorporate the same factors; and (2) did not incorporate the livestock intensity, frequency, timing, season of use, or precipitation pattern factors into its LHE analysis of whether ecological sites met objectives. (Doc. 55 at 14-15.)

In the supplemental report, BLM notes that it "used PBI data where the data was relevant for developing objectives" and "used data from 48 PBI plots on canopy

cover and saguaro recruitment when trying to ascertain where ecological sites were achieving objectives," but that it "could not use PBI data in determining whether livestock grazing use was causing the non-achievement of Land Health Standard 3 because PBI data did not measure utilization or contain information for use pattern mapping." (Doc. 59-1 at 10.) The report summarizes that it thus "used relevant PBI data for developing objectives and determining whether ecological sites met objectives," but because the "PBI data did not measure utilization or provide use pattern mapping information, BLM could not use the PBI data for determining whether livestock grazing was causing non-achievement of Land Health Standard 3." (*Id.* at 10-11.)

The supplemental report misses the point and fails to address the Court's concern regarding the rejection of some PBI data at the meeting-objectives step of the LHE analysis. Specifically, the supplemental report fails to explain why, at the meeting-objectives step, BLM rejected some of the PBI data for failure to incorporate certain factors, yet used other PBI data (from the 48 plots) and BLM data that failed to incorporate those same factors in determining whether the ecological sites were meeting objectives.

In its cross-motion for summary judgment, BLM contends that it is only at step three—the causation step—that BLM excluded some of the PBI data because of the failure to consider the listed factors. (Doc. 66 at 16.) In support of this contention, BLM cites to its supplemental report and to AR 074554, 074659, and 074175.

As already noted, the supplemental report does not address the Court's concern. Further, the supplemental report does not include the explanation that BLM is now putting forward in its brief—that BLM did not exclude the PBI data based on the failure of the data to consider the listed factors at the meeting-objectives step (step two) but instead only did so at the causation step (step three).

The citations to the AR BLM provides in support of its position are of no assistance. The record at two of these citations merely discusses the data analyzed in determining causation, which is step three of the analysis (AR 074554), and sets forth the general criteria for meeting Standard 3 (AR 074659).

The record at the third citation provided by BLM (AR 074175) actually supports WWP's position rather than BLM's. In this section of the record, BLM discusses the data it used for determining ecological conditions within the monument, which is the meeting-objectives (second step) of the analysis. Within this section, BLM discusses why it declined to use data from many of PBI's plots. The reasons given by BLM are that some of the PBI plots did not fit BLM's criteria for selection of a key area; that some of the PBI plots overlapped multiple ecological sites; and that some of the PBI plots were located too close to livestock waters. (AR 074175.) However, BLM also states in this section:

> PBI's study was of limited use because it did not address the intensity, frequency, timing, class of livestock, season of use, ecological sites, precipitation patterns, and other variables the BLM needs to address the effects of current livestock grazing practices on the objects of the Monument. However, BLM did use some of PBI's plot data (where applicable) to address vegetation attributes when defining Ecological Site and Key Area desired plant community (DPC) objectives.

(*Id.*)

This explanation indicates that PBI data was rejected for use at the meeting-objec-

tives step due to the failure of the data to incorporate the listed factors. The explanation also specifically notes and distinguishes the setting-objectives step (the first step), explaining that PBI data was used for that purpose. This further supports the conclusion that PBI data was rejected at the meeting-objectives (the second step) due to the failure of the PBI data to consider the listed factors. (*See id.*)

Further, in responses to comments objecting to BLM's use of only some of the PBI data in determining the condition of the ecological sites (the meeting-objectives step), BLM again raised the failure of the PBI data to consider the listed factors as one of the reasons for not using the data. (*See* AR 074348-49, AR 074352-52, AR 074353-54.)

In sum, the AR indicates that one of the reasons some of the PBI data was rejected for use in the meeting-objectives step was because the data did not incorporate the listed factors, and neither the AR nor the supplemental report provides a reasonable explanation for that rejection. To the extent BLM argues that PBI data was not rejected at the meeting-objectives step for failure to consider the listed factors, but instead was only rejected at the causation step on that basis, this is a new explanation or rationalization that is not contained in the AR and indeed is contradicted by the AR.

### b. Exclusion of PBI data because it was only one year of data

BLM also rejected some PBI data based in part on the fact that the PBI data was only a single year's data and was thus not enough to support sound conclusions, yet BLM relied on only a single year of its own data in determining whether objectives were being met. The Court found exclusion of PBI data on this ground to be arbitrary and capricious because BLM did not provide any explanation for why it was

acceptable to use just a single year's BLM data for its determination of whether the objectives were being met, but then reject the PBI data in part because a single year's data is not enough to support sound conclusions. (Doc. 55 at 16-17.)

The supplemental report, again, misses the point of concern. The report states that BLM did not reject the PBI data "based only on the fact that it was a single year's data" and that although the PBI data, by itself, could not support a conclusion regarding establishment of objectives, it was used "in conjunction with ESDs to assist BLM in establishing" the objectives. (Doc. 59-1 at 11.) In other words, the report is, again, focusing on the setting-objectives step. However, the Court's concern is BLM's failure to use PBI data at the meeting-objectives step of the analysis, not at the setting-objectives step. (Doc. 55 at 16-17.)

The supplemental report does go on to address the meeting-objectives step, but does not discuss BLM's failure to use the PBI data at this step. Instead, the report discusses the use of a single year of BLM data at this step, stating:

> BLM's single year data was used as a baseline to determine whether sites were meeting objectives. BLM's baseline data, by itself, also did not support a conclusion. Rather, BLM used a variety of data including inventory, monitoring records, assessments for [Land Health Standard 1 factors], and knowledge of the locale, in conjunction with the single-year data used as a baseline, to assist in making the determination on achievement or non-achievement of land health standards.

(Doc. 59-1 at 11 (citing AR 074553-54, 074683-84).)

The supplemental report provides no explanation as to why it was reasonable to

reject use of some PBI data at the meeting-objectives step based in part on the ground that the PBI data was only a single year's data and a single year's data is "not enough to support sound conclusions," then use other PBI data and BLM data that was also only a single year's data. Further, the supplemental report's assertion that it did not just use the BLM data at the meeting-objectives step, but also relied on other information "in conjunction with the single-year data" (Doc. 59-1 at 11) does not explain why BLM could not, then, similarly use the single-year PBI data along with the other information at this step.

BLM contends, in its brief, that "the use of one year of data was not BLM's reason for rejecting the PBI data" and that, "in fact, it used some of that data where it met key area requirements." (Doc. 66 at 17.) However, as noted above, BLM indicated previously and in the AR that some PBI data was rejected in part due to the fact that it was only one year's data and could not support strong conclusions. (*See* Doc. 59-1 at 11 (stating that the PBI data was not rejected "based only on the fact that it was a single year's data"); AR 062582 (letter objecting to BLM's use of data only from 48 of 320 PBI plots in determining landscape condition); AR 74107-08 ("While the PBI data added to the BLM's baseline information, one year of PBI data, in itself, is not enough to support sound conclusions.").)

Further, the AR demonstrates that BLM determined whether the objectives were being achieved based on BLM data and some PBI data. (AR 74622-30.) For example, for Limy Fan, the record states:

"Data from Key Area BH-3 (11 percent) and PBI study site 58 (8 percent) indicate that both achieve the canopy cover objective." (AR 074623.) There is simply no indication that, at the meeting-objectives step, any consideration was given to other information "in conjunction with the single-year [BLM] data" and selected PBI data. (Doc. 59-1 at 11).

In sum, the supplemental report's explanation for its rejection of some PBI data at the meeting-objectives step is a new rationalization and is inconsistent with BLM's previous explanations and the AR.

**D. Determination of Whether Grazing Caused Failure to Meet Objectives— the Causality Determination**

 At the causation step, BLM again relied on a single year's data, in this case utilization data from 2009 (which measured livestock utilization during the 2008 grazing season). The Court previously found that BLM failed to provide a reasonable explanation in the AR for its reliance on a single year's data in light of BLM's rejection of PBI data in part because of BLM's determination that a single year's data is not enough to support sound conclusions.[8] The Court also previously found that BLM failed to address concerns raised by a peer reviewer regarding the use of a single year's data. (Doc. 55 at 20-22.)

In the supplemental report, BLM responds that it only possessed one year of utilization data and thus could not have relied on more than one year of data. (Doc. 59-1 at 12; *see* Doc. 66 at 17.) However, the failure of BLM to collect additional data does not justify reliance on insufficient

---

8. The Court understands that BLM used the justification that a single year's data is not sufficient to support sound conclusions in connection with the meeting-objectives step of the LHE. *See* AR 74107-08 ("While the PBI data added to the BLM's baseline informa-

tion, one year of PBI data, in itself, is not enough to support sound conclusions.") However, BLM has not explained why that justification would not apply equally to the use of a single year's utilization data at the causation step.

data. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir.2011) (agency has obligation under NEPA to gather the data necessary for making an informed decision).

BLM contends that, by the time peer reviews occurred, it could not have gathered more data because of the deadline that had been set in *Western Watershed Project v. BLM*, Case No. CV–08–01472–PHX–MHM, which required BLM to release its Record of Decision by December 15, 2011. However, as BLM acknowledges, the deadline in that case was later extended to September 15, 2012. (Doc. 66 at 16.) Further, as WWP points out, BLM began the LHE process in 2005, and did not issue the final RMP until September 2012. (Doc. 68 at 11.) Moreover, the peer review comment expressing concern with the use of only a single year's utilization data is dated November 13, 2009 (AR 083942), almost three years before BLM issued the RMP. BLM had also recognized by early October 2009 the problems with determining causation based only on 2009 utilization data, and that additional utilization data should be collected. (*See* AR 055055 ("Utilization data was collected during a season of abundant precipitation that allowed for ephemeral livestock grazing authorizations, confounding the survey results."); AR 055530 ("These data were collected during a year with ephemeral livestock authorizations. In 2008 ephemeral forage plants added materially to the perennial forage base. Additional utilization data should be collected.").) BLM does not explain why it could not have conducted additional utilization monitoring either prior to or after it gathered the 2009 data.

In the supplemental report, BLM also states that it "determined that one year of utilization data was accurate to explain the causality where Land Health Standard 3 was not achieved because the precip-itation/forage production represented an average year." (Doc. 59-1 at 12 (citing AR 074616-17, 074644).) The citations to the AR provided by BLM do not, however, support this explanation. The citations are merely to pages that provide the AUMs for the years 1998-2007 (AR 074616-17); and permitted grazing allotment use and ten-year average use on the allotments on the SDNM (AR 074617, 74644). Other than AR 074616, which includes a table showing perennial AUMs and ephemeral AUMs for years 1998-2007, but does not include 2008, there is no discussion of ephemeral and perennial forage. There is a discussion at AR 074617-18 regarding precipitation, and a precipitation table that shows that 2008 was an above average year for precipitation. However, there is no discussion or explanation of why using only one year of utilization data from 2009 would provide accurate or sound conclusions regarding causation.

As to BLM's failure to respond to a peer reviewer's comments (*see* Doc. 55 at 21; AR 083492), the supplemental report does not directly address that deficiency. BLM contends in its brief that it did respond to the peer reviewer's comments "by explaining that [the 2009] data was from an average year." (Doc. 66 at 18 (citing AR 074349).) However, the response cited by BLM was not to the peer reviewer's comments but instead to a comment by WWP that "BLM used a year with above-average precipitation (2008) in which to measure utilization." (AR 074349.) BLM's response to this WWP comment states: "In 2008, precipitation at Gila Bend was slightly above average and Maricopa was slightly below average, resulting in an average production year." (*Id.*) Thus, the cited response by BLM was to a comment by WWP and not to the peer reviewer's comment at issue here.

As the Court noted previously, the peer reviewer expressed concern that utilization data from only one year was relied on by BLM; and that the single year's data was from a year that had ephemeral production that could be utilized by livestock and did not account for the long-term effects to vegetation, or use patterns, that might occur in nonephemeral years in which livestock graze on more perennial plants. (Doc. 55 at 21; *see* AR 083492.) BLM still has not have provided a citation to the AR where it responded to this comment.

The supplemental report does explain that BLM determined "the ephemeral production in 2008 did not sufficiently depart from the norm to make utilization data from 2009 non-representative of an average year." (Doc. 59-1 at 12.) BLM contends that this provides a sufficient explanation for its use of one year of data—that it was reasonable to do so because the year in question represented an average year and because the ephemeral production in 2008 did not sufficiently depart from the norm for an average year. (Doc. 66 at 16.) BLM has not, however, provided a citation to the AR in support of this explanation regarding ephemeral production.[9] (*See* Doc. 59-1 at 12; Doc. 66 at 16.) Further, the explanation does not address the peer reviewer's concern regarding the long-term impacts or use patterns that might occur in non-ephemeral years. BLM's explanation is thus not sustained by the record and is a new rationalization for its use of only single year's utilization data.

### Conclusion

BLM has failed to adequately explain some of the decisions[10] that led to the

LHE and compatibility determinations, and failed to address significant concerns raised in a peer reviewer's comments. Although the supplemental report provided by BLM provides explanations in response to the Court's previous Order, most of the explanations do not sufficiently address the deficiencies identified by the Court, are not sustained by the record, or are new rationalizations for BLM's decisions that cannot be used to cure the deficiencies identified by the Court. The Court therefore holds that the LHE is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

The Court will grant summary judgment in favor of WWP, and will order BLM to complete a new LHE and compatibility determination under NEPA and incorporate those decisions into the RMP. The Court will deny BLM's cross-motion for summary judgment.

WWP does not seek, and the Court will not order, that BLM's grazing decisions or the grazing portion of the RMP be vacated. Thus, grazing under the RMP can continue while BLM completes a new LHE and compatibility determination. In light of the length of time it took BLM to complete its first analysis, WWP requests that the Court set a deadline for completion of the new analysis. The Court believes that such a deadline is appropriate. However, the Court also is aware of the limited resources available to BLM and understands that BLM may need to gather additional data. The Court will therefore require the parties to confer and provide a

---

**9.** The supplemental report does cite AR 074617-18, which has a precipitation table showing average precipitation for both Gila Bend and Maricopa Counties was above average in 2008. These pages of the AR do not, however, address ephemeral production or

otherwise provide support for the explanation provided in the supplemental report.

**10.** The Court has considered and finds it unnecessary to address additional arguments raised by the parties.

joint statement proposing an appropriate deadline.

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 64) is granted to the extent it seeks to require BLM to complete a new LHE analysis and compatibility determination.

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment (Doc. 66) is denied.

IT IS FURTHER ORDERED that BLM shall complete a new LHE analysis and compatibility determination under NEPA and incorporate those decisions into the RMP.

IT IS FURTHER ORDERED that the parties shall confer and file, by **April 22, 2016** a joint statement proposing an appropriate deadline for BLM's completion of a new LHE and compatibility determination, and incorporation of that information into the RMP.